James J. **PARISE**, Jr., and Deborah L. Parise, his wife, Plaintiffs,

v.

**AAA WAREHOUSE CORPORATION** a/k/a Triple A Warehouse, a corporation, Defendant.

**Civ. A. No. 74–651.**

United States District Court, W. D. Pennsylvania.

Nov. 15, 1974.

Henry G. Beamer, III, Pittsburgh, Pa., for plaintiffs.

Raymond G. Hasley, Pittsburgh, Pa., for defendant.

## OPINION AND ORDER

SNYDER, District Judge.

The Plaintiffs, James J. Parise, Jr. and his wife, Deborah L. Parise (Parise), bring this suit pursuant to 28 U.S. C. § 1332 for personal injuries allegedly suffered by the Husband-Plaintiff as a result of the negligence of the employees of the Defendant, AAA Warehouse Corporation a/k/a Triple A Warehouse (AAA), and for damages suffered by the Wife who was forced to quit her job in order to care for her husband, and for her loss of the society, companionship and services of her husband.

Parise reside in Jefferson County, Pennsylvania, within the territorial jurisdiction of this Court. AAA is an Indiana corporation engaged in the loading of goods and products for shipment and transportation in interstate commerce

with its principal offices in Indianapolis, Indiana.

Parise aver that on September 10, 1972, the Husband-Plaintiff was injured when a railroad car door disengaged and fell directly on top of him. At the time of the accident, he and several other men were attempting to close the sliding door on a freight car loaded with flour which had been delivered to the siding of their employer, Jefferson Wholesale Grocery Company (Jefferson). The flour had been stored in AAA's warehouse in Indianapolis for International Multi-Foods, Inc. (International), a food distributor incorporated in Minnesota. Jefferson purchased the flour from International who then instructed AAA to load the flour into the freight car in question. This was done by AAA's employees in Indianapolis and the freight car was transported to its destination by the Penn Central and the Baltimore and Ohio Railroads. The Complaint alleges that AAA failed to inspect, maintain, repair and/or warn of the alleged defective condition of the freight car.

Parise filed this action on July 3, 1974, and service was made on AAA by registered mail through the Secretary of the Commonwealth. AAA now moves this Court to dismiss the case for lack of jurisdiction contending service was not proper under Pennsylvania's "Long-Arm" Statute or in the alternative, if the Statute is interpreted as providing jurisdiction over the Defendant in the circumstances of this case, it is contended the Statute is unconstitutional as contravening the minimum contacts requirement of the Due Process Clause of the Fourteenth Amendment.

## DISCUSSION

Where federal jurisdiction is predicated upon diversity of citizenship, in personam jurisdiction "is determined in accordance with the law of the state where the court sits, with 'federal law' entering the picture only for the purpose of deciding whether a state's assertion of jurisdiction contravenes a constitu-

tional guarantee." Arrowsmith v. United Press International, 320 F.2d 219, 223 (2d Cir. 1963). *Accord,* Gorso v. Bell Equipment Corporation, 476 F.2d 1216 (3d Cir. 1973). Acquisition of jurisdiction over the Defendant here is sought pursuant to the "Long-Arm" Statute of Pennsylvania, 42 Pa. S. § 8301 et seq., Act of November 15, 1972, P.L. ——, No. 271, eff. in 90 days, providing that to be amenable to jurisdiction in Pennsylvania, a foreign corporation must be "doing business" within the State, as statutorily defined: (42 Pa. S. § 8309(a))

> "*General rule.*—Any of the following shall constitute 'doing business' for the purposes of this chapter:
>
> (1) The doing by any person in this Commonwealth of a series of similar acts for the purpose of thereby realizing pecuniary benefit or otherwise accomplishing an object.
>
> (2) The doing of a single act in this Commonwealth for the purpose of thereby realizing pecuniary benefit or otherwise accomplishing an object with the intention of initiating a series of such acts.
>
> (3) The shipping of merchandise directly or indirectly into or through this Commonwealth.
>
> (4) The engaging in any business or profession within this Commonwealth, whether or not such business requires license or approval by the Commonwealth or any of its agencies.
>
> (5) The ownership, use or possession of any real property situate within this Commonwealth."

Chief Judge Seitz of our Circuit has outlined the development of this statute in the *Gorso* case: (476 F.2d at 1218–1220)

> "In 1968, Pennsylvania amended the terms of its 'long-arm' statute as applied to foreign corporations so as to extend its reach. It presently states:
>
> > 'For the purposes of determining jurisdictions of courts within this Commonwealth, the doing by any corporation within this Common-

wealth of a series of similar acts for the purpose of thereby realizing pecuniary benefit or otherwise accomplishing an object, or doing a single act in this Commonwealth for such purpose, with the intention of thereby initiating a series of such acts, shall constitute "doing business." For the purpose of this subsection, the shipping of merchandise directly or indirectly into or through this Commonwealth shall be considered the doing of such an act in this Commonwealth.'

15 P.S. § 2011(C). This was the final step in a series of legislative responses to successive judicial interpretations of amendments to the 'long-arm' statute. In each case, the state courts had construed the legislative purpose as not intending to extend jurisdiction over a foreign corporation in a specified instance even though it was constructively present within the state. Each time, the legislature thereafter had amended the statute so as to broaden its scope.

For our purposes, only the last two amendments of the statute need be examined. The first amendment in 1963 involved the companion statute to § 2011(C)—§ 2011(B) [15 P.S. § 2011 (B) (1967)]. Previous to the amendment, the statute had read, in part:

'Any foreign business corporation which shall have done any business in this Commonwealth, without procuring a certificate of authority to do so from the Department of State, shall be conclusively presumed to have designated the Secretary of the Commonwealth as its true and lawful attorney authorized to accept, on its behalf, service of process in any action arising [out of acts or omissions of such corporation] within this Commonwealth. . . .'

Based upon this language, the Supreme Court of Pennsylvania had held that before jurisdiction over a foreign corporation would lie, the tortious activity sued upon must have arisen out of an act or omission by the foreign corporation while it was actually present within the state. Rufo v. Bastian-Blessing Co., 405 Pa. 12, 173 A.2d 123 (1961). The legislative response in 1963 was to amend § 2011(C) by striking out the requirement of 'acts or omissions' within the Commonwealth—the language upon which the state supreme court had predicated its decision.

The second, and most recent, step came in response to judicial interpretations of the 'doing business' and 'entry' requirements found in the predecessor of § 2011(C). The Superior Court of Pennsylvania construed the statute as not extending jurisdiction over a foreign lamp manufacturer which dealt through independent contractors in Pennsylvania. Cecere v. Ohringer Furniture Co., 208 Pa.Super. 138, 220 A.2d 350 (1966). This decision was based upon the interpretation the Supreme Court of Pennsylvania had given these terms. See, e. g., Miller v. Kiamesha-Concord, Inc., 420 Pa. 604, 218 A.2d 309 (1966). The superior court concluded that although the Commonwealth had the constitutional power to reach the defendants, the legislative intent, as interpreted by the state supreme court, was not to extend state jurisdiction to those limits permissible under due process.

Two years later, in 1968, the legislature passed the current version of § 2011(C). It deleted the 'entry' requirement and stipulated that 'the shipping of merchandise directly or indirectly into or through this Commonwealth shall be considered "doing business." ' In so doing, the legislature eliminated the requirement of an actual corporate presence as a condition precedent to the exercise of jurisdiction over a foreign corporation. Rather, it made jurisdiction depend upon whether the corporation derived revenues from activity within the state; the distribution and marketing

system which it set up for deriving those revenues was rendered immaterial for jurisdictional purposes.

An additional factor which has been seen as influencing the passage of the 1968 amendment was the adoption by the Supreme Court of Pennsylvania of the position of § 402A, Restatement of Torts 2d, on strict liability in tort for defective products. The supreme court thereby sought to provide better protection for state residents against defective products. Webb v. Zern, 422 Pa. 424, 220 A.2d 853 (1966). The passage of the amendment complemented these efforts by providing a local forum for suits against foreign manufacturers of such products."

Judge Seitz then held that the Pennsylvania Statute, at that time, did not reach the constitutionally permissible limit. Subsequent to the filing of the Opinion in *Gorso,* a 1972 Amendment provided a new sub-section extending the jurisdiction of the Courts of the Commonwealth to the maximum allowed under the Constitution of the United States and provides as follows: (42 P.S. § 8309(b))

"(b) *Exercise of full constitutional power over foreign corporations.*—In addition to the provisions of subsection (a) of this section the jurisdiction and venue of courts of the Commonwealth shall extend to all foreign corporations and the powers exercised by them to the fullest extent allowed under the Constitution of the United States."

*Cf.* Proctor & Schwartz, Inc. v. Cleveland L. Co., 228 Pa.Super. 12, 323 A.2d 11 (1974).

It is noted that *Gorso* held service had been made under the prior statute and had not been attempted under the 1972 Amendment and, thus, the Court did not consider the issue of retroactive versus prospective application, nor the constitutional efficacy of such service, if made.[1]

The burden of establishing that the Defendant did business in Pennsylvania at the time of the purported service rests upon the Plaintiffs. Nelson v. Doll Furniture Company, 304 F.Supp. 159, 161 (E.D.Pa.1969); Optico Corporation v. Standard Tool Company, 285 F.Supp. 46, 48 (E.D.Pa.1968).[2] There appears to be no real dispute as to the operative facts which have been gleaned from the Complaint, the Motion to Dismiss, accompanying Affidavit and the Attached Exhibit filed in this Court, that AAA was engaged in the loading of goods and products for shipment and transportation in interstate commerce. On or about August 31, 1972, in Indianapolis, Indiana, AAA unloaded and then loaded the railroad freight car in question for shipment in interstate commerce. Paragraph Eight of the Complaint alleges numerous acts of omission relating to AAA's failure to inspect, maintain, repair and/or warn the Husband-Plaintiff of the alleged defective condition.

AAA's Motion to Dismiss, verified by an uncontradicted supporting affidavit, sets forth *inter alia* the following:

"[1.] Defendant has never maintained any office, bank account, mailing address, telephone listing, or other business facility in the Commonwealth of Pennsylvania.

[2.] Defendant has never had any affiliates or subsidiaries which engaged in business in the Commonwealth of Pennsylvania.

[3.] Defendant has never owned any property in the Commonwealth of Pennsylvania, nor has it ever paid or been called upon to pay any Pennsylvania taxes.

[4.] Defendant has never solicited any business in Pennsylvania. [This contention is weakened by the supplemental affidavit.]

[5.] The acts of defendant alleged in paragraph 6 of plaintiffs' complaint, i.

---

1. F.N. 6, 476 F.2d at p. 1223.

2. *Accord,* Hill v. J. M. Lehmann Company, 345 F.Supp. 1267, 1268 (E.D.Pa.1972).

e. unloading and loading a railroad car at Indianapolis, Indiana, were services performed and completed exclusively at Indianapolis, Indiana, at the request of and for the benefit of International Multi-Foods, Inc. (International).

[6.] The goods loaded by defendant at the direction of International were not owned, shipped, or under the control of defendant but were under the control of International and/or the Penn Central Transportation Company (Penn Central), the receiving common carrier.

[7.] Defendant's services in loading and unloading of the freight car, as described more fully in plaintiffs' complaint, were not intended to derive a pecuniary benefit for defendant in Pennsylvania and did not derive a pecuniary benefit for defendant in Pennsylvavnia."

AAA, thus, takes the position that it never did any act within the State, or ever shipped anything into or through Pennsylvania. They contend the mere loading of goods in Indianapolis for shipment in interstate commerce, and the specific loading of the freight car in question for shipment in interstate commerce does not come within any of the statutory standards of Pennsylvania's "Long-Arm" Statute.

In his Supplemental Affidavit in Support of Defendant's Motion to Dismiss, Jack Larman, President of AAA, certified that for the purpose of informing potential customers of AAA's facilities and services, as offered in Indianapolis, AAA had mailed a brochure (approximately once a year for several years) to two thousand of the largest corporations throughout the United States. (Approximately one hundred of these were mailed to companies in Pennsylvania.) The brochure, in describing the facilities which were available, stated:

"On the architects' drawing inside this folder, there are six adjoining buildings of 128,000 sq. ft. each. We have 84 truck doors, 63 rail spots and stacking heights of 26 ft. These buildings are heated, sprinklered and alarm protected for fire and theft.

This is one of the finest public warehousing distribution centers in the United States.

\*  \*  \*  \*  \*  \*

We have one of the very best trucking centers in the entire United States serving 70 MILLION PEOPLE, with first and second day delivery and giving immediate service for outgoing shipments. Rail cars move through the railroads' switching area, in most cases, in one day. Indianapolis has an excellent past history for good labor relations in the transportation industry.

\*  \*  \*  \*  \*  \*

These are just a few of the reasons to bring your distribution to Indianapolis, serving the Middle-West, or the entire United States, as some of our accounts are presently doing."

AAA's activities would not appear to come within the context of the original definition of "doing business", unless it can be determined to come within the perimeters of § 8309(a)(3): "The shipping of merchandise directly or indirectly into or through this Commonwealth." It will be recalled that the flour was owned by International, which instructed AAA to load the flour into a facility of a common carrier. AAA neither controlled nor had the right to control the ultimate destination or disposition of the goods. All of AAA's services were performed and completed at Indianapolis so that under these circumstances International, not AAA, was the "shipper" of the goods into Pennsylvania; but if James Parise's injuries were proximately caused by the improper loading of the goods, the responsibility would be AAA's.

In a similar situation, in Nelson v. Doll Furniture, *supra*, one of the defendants, a foreign corporation which processed a furniture stripping fluid, sold a quantity of the fluid to the Doll Company. At Doll's request it shipped $79.98 worth of fluid into Pennsylvania on one occasion, and there was nothing on the record to show any prior or subsequent

shipments or other acts of any kind carried out by that defendant in Pennsylvania. The Court there held that the defendant was not "doing business" in Pennsylvania, and was not subject to personal jurisdiction. To the same effect is Gorso v. Bell Equipment Corporation, *supra.*

This does not end our inquiry, however, for we must now determine the effect of subsection (b) of § 8309, captioned: "Exercise of full constitutional power over foreign corporations." Under this provision, the inquiry turns to whether the exercise of personal jurisdiction over AAA in Pennsylvania is consistent with the requirements of Due Process.

The concepts relating to the extension of personal jurisdiction over non-resident defendants were fully explored in Hanson v. Denckla, 357 U.S. 235, 78 S. Ct. 1228, 2 L.Ed.2d 1283 (1958); McGee v. International Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957); International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

"The thrust of these decisions is that sufficient 'minimum contacts' must exist in the forum state so that jurisdiction over nonresident defendants is reasonable and just according to traditional concepts of fair play and substantial justice. [citation omitted] Whether sufficient minimum contacts exist cannot be answered by applying a formula or rule of thumb, but by ascertaining what is fair and reasonable in the circumstances of the particular situation. In applying this flexible test the relevant inquiry is whether a nonresident has engaged in some act or conduct by which he may be said to have invoked the benefits and protection of the laws of the forum." Hutter Northern Trust v. Door County Chamber of Commerce, 403 F.2d 481, 484 (7th Cir. 1968).

In this case Plaintiffs seek to serve process pursuant to § 8302(a) of the "Long-Arm" Statute, which provides:

"*General rule.*—Any foreign corporation which shall have done any business in this Commonwealth without procuring a certificate of authority to do so from the Department of State as required by statute, shall be conclusively presumed to have designated the Department of State as its true and lawful attorney authorized to accept, on its behalf, service of process in any action arising within this Commonwealth. Service of process shall be made in the manner provided by section 8307 of this title (relating to procedure for service of process)." 42 Pa.S. § 8302(a).

Essential to the application of this Section is a finding that the Defendant Corporation had done business in Pennsylvania as defined by § 8309(a) or (b). As noted previously, subsection (a)(3) makes "the shipping of merchandise directly or indirectly into or through this Commonwealth" an independent form of "doing business" without any requirement that shipment be made with the intention of initiating a series of such acts. Aquarium Pharm., Inc. v. Industrial Press. & Pack., Inc., 358 F. Supp. 441, 443 (E.D.Pa.1973) and Gorso v. Bell Equipment Corporation, *supra.* Then finally, the new statute added to the list of "doing business" activities, the engaging in any business or profession within the State, § 8309(a)(4), and the ownership, use, or possession of any real property situated in the State, § 8309(a)(5).

Reviewing the factual situation with this background in mind, the Plaintiffs do not contend that the Defendant is engaging in any business or profession within the State, or has owned, used or possessed any real property within the State, but contend that 42 Pa.S. Section 8309(a)(1), the "series of acts", (2) the doing of a single act in this Commonwealth or "otherwise accomplishing an object with the intention of initiating a

**1082**

series of such acts", and (3) the shipping of merchandise directly or indirectly into or through this Commonwealth, do apply. These contentions are discussed below.

Since the adoption of the original "doing business" provisions of the Act of 1959 (Business Corporation Law, 15 Pa.S. § 2011, subd. C), the "series . . . or single act" language of the original provisions was not altered by subsequent amendment. Thus, the Pennsylvania cases under these pertinent provisions of § 2011, subd. C are relevant precedent to our interpretation of subsections (a)(1) and (a)(2) of the new law. Myers v. Mooney Aircraft, Inc., 429 Pa. 177, 240 A.2d 505 (1967) and Gorso v. Bell Equipment Corporation, *supra*. In *Myers* the Pennsylvania Supreme Court stated: (240 A.2d at p. 510)

" . . . The statute contemplates [by the use of 'series . . . or single act' language] a systematic course of conduct as contrasted with isolated or sporadic occurrences . . . "

In *Gorso* the above language was held controlling to the determination of whether the acts of two foreign corporations constituted "doing business". *Gorso* involved the manufacturer of a tower crane used in the construction industry, while the other defendant was the exclusive world sales agent. Neither company was registered to do business in Pennsylvania nor did they maintain any offices in the State. Through a national sales agent of the company, a crane was sold outside the State of Pennsylvania to a Kansas corporation which, after use in Ohio, caused the crane to be delivered and used at a job site in Pennsylvania. The crane collapsed and injured several workers in Pennsylvania. It was averred that one possible contact upon which a finding of "doing business" could be based was the commission of a tort within Pennsylvania (since Pennsylvania adopted the theory that a foreign corporation is constructively considered to have committed the tortious act at the

place at which the tortious conduct culminates in injury; Wilk v. Ensign Bickford Co., 421 Pa. 161, 164, 218 A.2d 778 (1966)). Additionally, defendants had made several deliveries of spare parts into Pennsylvania. These contentions were dismissed by the Court, as follows:

"In this context, we are unprepared to say the two shipments of spare parts into the state combined with the constructive tortious conduct within the state together demonstrated a systematic course of conduct within Pennsylvania by appellants. Rather, they are no more than sporadic occurrences and resultantly, are insufficient to satisfy statutory prerequisites for the exercise of personal jurisdiction by the state courts in the absence of a prior in-state sale."

▮ In Hanson v. Denckla, *supra*, Chief Justice Warren stated:

"The application of that rule [minimum contacts] will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." (357 U.S. 253, 78 S.Ct. 1240, 2 L.Ed.2d 1298).

Applying these principles to the instant matter, it is clear that the exercise of jurisdiction over AAA under Pennsylvania's "Long-Arm" Statute would not violate the Due Process requirements of the Constitution.

In Perkins v. Benguet Consol. Min. Co., 342 U.S. 437, 445, 72 S.Ct. 413, 96 L.Ed. 485 (1952), the Supreme Court concluded that jurisdiction was "fair and reasonable" when the defendant engaged in substantial business activity within the State. In *McGee*, *supra*, the Court held that "[i]t is sufficient for purposes of due process that the suit was based on a contract which had substantial connection with [the forum] State." (355 U.S. at p. 223, 78 S.Ct. at p. 201). Under the *McGee* test, due process re-

quirements are satisfied if the "cause of action" has a substantial connection with the forum State. Bernardi Bros., Inc. v. Pride Manufacturing, Inc., 427 F.2d 297, 299 (3d Cir. 1970).

In determining whether or not our factual situation has substantial connection with Pennsylvania, the case of Consolidated Laboratories, Inc. v. Shandon Scientific Co., 384 F.2d 797 (7th Cir. 1967) is most instructive. In that case tortious conduct, alleged to be the advertisement and solicitation of sales in violation of the plaintiff's contractual rights, occurred within the forum State. In addition, the harm to the plaintiff was suffered in that State. The Seventh Circuit, citing *McGee*, held that the contacts between the defendants and the forum State were sufficient to satisfy the requirements of Due Process. In our case, as well, there has been advertisement and solicitation of business and while the initial tortious conduct took place outside of Pennsylvania, § 8305 [3] makes such conduct the basis for service of process. When one considers the solicitation of business in Pennsylvania, the doing of acts outside of Pennsylvania which, when not carefully done (as alleged), caused harm within this Commonwealth, this Court concludes that the Defendant's conduct constituted a "substantial connection" under the *McGee* decision, sufficient to justify the exercise of jurisdiction over this Defendant. *Cf.* Gray v. American Radiator & Standard Sanitary Corp., 22 Ill.2d 432, 176 N.E.2d 761 (1961), where a hot water heater containing one of defendant's valves exploded and caused injury in Pennsylvania. The valve was manufactured and sold outside the State, and the tortious act was only constructively committed there. The Court applied the constitutional test of due process and citing the *International Shoe* and *Hanson* cases noted that:

" . . . the relevant inquiry is whether defendant engaged in some act or conduct by which he may be said to have invoked the benefits and protection of the law of the forum. . . . To the extent that its business may be directly affected by transactions occurring here it enjoys benefits from the laws of this State, and it has undoubtedly benefited, to a degree, from the protection which our law has given to the marketing of hot water heaters containing its valves." (at pp. 765 and 766).

In Aamco Automatic Transmissions, Inc. v. Tayloe, 368 F.Supp. 1283 (E.D. Pa.1973), an action was brought by a franchisor against the franchisee and three foreign corporations which allegedly conspired with the franchisee defendant to violate the agreement and intentionally interfered with contractual relations of the plaintiff. The Court concluded that the "defendants [had] not conducted any activity in the State of Pennsylvania from which a similar conclusion of 'benefit and protection' receipt can be drawn." Id. at 1299. In *Aamco*, plaintiff Aamco Automatic Transmissions and defendant Harry Tayloe entered into a written franchise agreement pursuant to which Tayloe was granted a license to operate an Aamco transmission repair shop. Personal jurisdiction over the defendants in that case was based on their constructive commission of torts within Pennsylvania. The Court had little difficulty in determining that the requirements of the "Long-Arm" Statute were met, under 42 Pa.S. § 8303 and § 8305. But, when it considered the constitutional question of

---

3. "§ 8305. *Causing harm by individuals*

Any nonresident of this Commonwealth who, acting outside of this Commonwealth, individually, under or through a fictitious business name, or through an agent, servant or employee, shall have caused any harm within this Commonwealth on or after August 30, 1970, shall be subject to service of process in any civil action or proceeding instituted in the courts of this Commonwealth arising out of or by reason of any such conduct. Service of process in any such civil action or proceeding shall be effected through the Department of State as provided in this chapter."

due process (§ 8309(b)) under the "minimum contacts" test established by the Supreme Court, the Court concluded that the defendants had not purposefully availed themselves of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws. While recognizing the rationale of the *Gray* case, the Court distinguished it with the following language: (368 F.Supp. at p. 1299)

> "In applying this rule, the *Gray* court inferred from the record substantial use and consumption within the state of appliances incorporating defendant's valves. Consequently, the court concluded that:
>
> > '[t]o the extent that its business may be directly affected by transactions occurring here it enjoys benefits from the laws of this State, and it has undoubtedly benefited, to a degree, from the protection which our law has given to the marketing of hot water heaters containing its valves.'

*Id.* at 766. In the instant case, defendants have not conducted any activity in the State of Pennsylvania from which a similar conclusion of 'benefit and protection' receipt can be drawn. *Gray,* therefore, does not control the instant suit.

I conclude that the principles of due process as interpreted by the Supreme Court in the previously examined cases prohibit the exercise of jurisdiction over Jimran, Crossroads, and Valencia under the applicable provisions of the Pennsylvania 'long-arm' statute."

In the case presently before us, it is concluded that principles as set forth in *Gray* are applicable. As noted, AAA actively solicited business within Pennsylvania by means of the brochures that it caused to be distributed. In United States Ry. Equip. Co. v. Port Huron & Detroit R. Co., 495 F.2d 1127 (7th Cir. 1974), the Seventh Circuit Court of Appeals reversed a decision of the District Court of Illinois [4] in which the district court had made the following observation in refusing to extend jurisdiction over a Michigan defendant: (58 F.R.D. at p. 591)

> "The interpretation by state and federal courts that the Illinois Long-Arm Statute does not extend Illinois jurisdiction to such cases as the instant action rests on logic and hard fact. To grant jurisdiction in such cases would have an adverse effect on commerce because such a decision would subject any customer of an Illinois business, manufacturer, or mail order house to Illinois jurisdiction in the event of suit arising solely out of the acceptance by mail of an Illinois resident's offer. The ultimate result would be to dissuade customers in foreign states from doing business by mail or even telephone with Illinois businessmen. [citations omitted]"

In reversing the decision, the Circuit Court distinguished what it termed "the *in terrorem* argument [of the district court] that the court's decision would allow large mail order houses to force distant buyers to defend suits in Illinois", by quoting the following passage from Colony Press, Inc. v. Fleeman, 17 Ill. App.3d 14, 18, 308 N.E.2d 78 (1974):

> "'It may not in fact be proper to require an out of state customer of a mail order house to defend an action here. However, this is not before us. Section 17 of the Civil Practice Act reflects a conscious purpose to assert jurisdiction over non-resident defendants to the extent permitted by the due process clause. * * * Illinois courts have recognized under this attitude that jurisdiction is not merely dependent upon contacts with this state but upon such factors as the nature of the business transaction, the applicability of Illinois law, the contemplation of the parties and the likelihood that witnesses would be found

---

4. United States Ry. Equip. Co. v. Port Huron & Detroit R. Co., 58 F.R.D. 588 (E.D.Ill.1973).

here. * * * *Here, defendant is a business company that had voluntarily entered into a business transaction with an Illinois plaintiff with plaintiff's performance wholly conducted within Illinois. Also, Illinois law would be applicable in disputes arising under this contract.* * * * In addition, * * * it may be said that defendant benefited from the services of the State of Illinois in the protection of these goods from theft and fire prior to their actual movement out of Illinois. * * * We conclude that there was sufficient minimum contacts in this one transaction for purposes of in personam jurisdiction so as not to offend traditional notions of fair play and substantial justice in requiring defendant to defend this action in Illinois.' [citation omitted]"

This result is consistent with the thrust of the Pennsylvania "Long-Arm" Statute, as recently interpreted by the Pennsylvania Superior Court in the case of Proctor & Schwartz, Inc. v. Cleveland L. Co., *supra*, and by this Court in the case of M & N Meat Company v. American Boneless Beef Corporation, 380 F. Supp. 912 (filed May 2, 1974).

While AAA's warehousing facility is wholly located in Indianapolis, Indiana, the distribution of brochures across the country was an attempt to broaden its customer base by solicitation of more interstate trade. The brochure praises AAA's warehouse loading facilities for interstate distribution by means of trucks and over the rails. Fairness dictates that both the immediate customers of this Defendant, as well as those other persons in the flow of commerce who receive goods from AAA at its customers' directions, have a right to expect the Defendant to safely load the products they warehouse. The nature of the business alone is sufficient to necessitate such a result. The Defendant cannot now be heard to disavow its actions in loading the freight car in question, and in allegedly causing the Plaintiff-Husband serious injury when, as a di-

rect result thereof, the door of the freight car fell on top of him. The Defendant has become involved in the privilege of conducting activities in the areas where it has specifically solicited such business.

It is concluded, therefore, that the principles of Due Process as interpreted by the United States Supreme Court do not prohibit the exercise of jurisdiction over the Defendant under the applicable provisions of Pennsylvania's "Long-Arm" Statute, and that the service in this case was effective. The Defendant's Motion to Dismiss will be denied.

An appropriate Order will be entered.